Receipt number AUSFCC-9754284

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

INTELLIBRIDGE, LLC, and
REVACOMM, INC.,

                              Plaintiffs,

        v.

UNITED STATES OF AMERICA,

                              Defendant.

24-1204 C

Case No. _____

## **COMPLAINT**

Hamish P.M. Hume
Samuel C. Kaplan
Gina A. Rossman
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
(202) 237-2727 (t)
(202) 237-6131 (f)
hhume@bsfllp.com
skaplan@bsfllp.com
grossman@bsfllp.com

*Counsel for Plaintiffs IntelliBridge, LLC and RevaComm, Inc.*

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

PARTIES ................................................................................................................... 4

JURISDICTION ........................................................................................................ 4

STANDING ............................................................................................................... 5

BACKGROUND ....................................................................................................... 6

    I.    Government Agencies Must Prioritize The Procurement Of Nondevelopmental
        Items............................................................................................................. 6

        A.    41 U.S.C. § 3307 Requires Agencies To Procure Nondevelopmental
               Items "To The Maximum Extent Practicable," And To Conduct Related
               Market Research. .................................................................................. 6

        B.    Section 8(A) Small Business Set-Asides Do Not Displace The
               Mandatory Nondevelopmental Item Preference And CMS Cannot Rely
               On Using An 8(A) To Circumvent That Requirement. ........................... 9

    II.    IntelliBridge Offers Nondevelopmental Products That CMS Can Practicably
        Procure To Meet CMS's ATO Acceleration Requirements, But CMS Is
        Proceeding With An Unlawful And Wasteful Developmental Effort. ......................... 9

        A.    Under The Old ATO Process, CMS Faced Delays and Wasted
               Resources In Complying With the Process for Ensuring Software
               Applications Met Government Security Standards........................................ 9

        B.    IntelliBridge Addressed CMS's Problem By Implementing A Highly
               Praised Solution Modeled On A Similar Platform It Developed For The
               Air Force. ............................................................................................ 12

        C.    Upon the Departure of CMS Officials Who Supervised the Successful
               batCAVE Effort, The Agency Officials Responsible For Prior Failures
               Are Seeking To Unlawfully Replace batCAVE With A New
               Developmental Solution.......................................................................... 15

        D.    CMS Is Separately Proceeding Through a Secret Sole-Source
               Procurement to Develop New Software to Mirror Features of
               IntelliBridge's Nondevelopmental Signal App............................... 20

CLAIMS FOR RELIEF .......................................................................................... 22

PRAYER FOR RELIEF .......................................................................................... 30

i

IntelliBridge, LLC ("IntelliBridge") and RevaComm, Inc. ("RevaComm," and together, "IntelliBridge") for its Complaint against the United States of America acting through the Centers for Medicare and Medicaid Services ("CMS"), allege as follows:

## INTRODUCTION

1.      This case asks the Court to enjoin two procurement solicitations issued by CMS that violate 41 U.S.C. § 3307 and associated regulations. These provisions require CMS to procure commercial or nondevelopmental items "to the maximum extent practicable" in lieu of developing new products to meet agency requirements.  Further, to ensure that CMS is adequately informed before making decisions, the same law requires CMS to conduct market research as to the availability of nondevelopmental items at each stage of the procurement process and to use that market research to make specific determinations as to the availability of nondevelopmental items to meet its needs. These provisions are designed to counteract the skewed incentives and inertia that otherwise can lead the Government to waste time and money attempting to reinvent the proverbial wheel when it is practicable to do otherwise.

2.      CMS is violating these provisions by seeking in two separate but related solicitations to pay contractors to develop new technology to meet requirements that IntelliBridge's software already satisfies.

3.      The first is an integrated platform (known as batCAVE) that automates much of the process for ensuring software applications ("apps") used by CMS meet the Government's stringent cybersecurity requirements. Prior to batCAVE, this process resulted in substantial delays, cost significant resources, and deterred app developers from making their products better. Modeled after a highly successful platform that IntelliBridge developed and continues to maintain for the U.S. Air Force, batCAVE reduced CMS's process to a matter of months. The batCAVE platform has also earned industry awards and widespread recognition for its innovative approach to

1

resolving this critical issue. Through the challenged solicitation, CMS is now attempting to develop a new version of this technology for requirements that batCAVE already meets.

4.      The second solicitation is a scheduling app (known as Signal) that enables CMS app developers to track their assessment status and view upcoming deadlines via a user dashboard. This product has likewise been extremely successful, both for CMS and the Air Force where a similar product is currently in use by over 620 Air Force Squadrons with over 34,000 users. CMS, however, has indicated to IntelliBridge that it is seeking to develop a new version of the product through an 8(a) solicitation that it failed to publish.

5.      CMS has issued these solicitations for an uncertain developmental effort without appropriate market research and without the considered determinations that the law mandates as to the practicability of meeting its requirements with a nondevelopmental item.  This alone is unlawful, but if anything, the situation is worse than that.  Through these solicitations, CMS is reverting to a developmental approach that has failed multiple times in the past to replace the very solutions that solved the problem and earned awards and widespread praise throughout the Government and by CMS end users.  Moreover, it is doing so for the worst (yet familiarly bureaucratic) of reasons—the officials who championed batCAVE (including CMS's Chief Information Officer and Chief Information Security Officer) left the agency for other positions. Their departure resulted in a power vacuum filled by the same legacy officials who had failed to solve the problem previously and who will benefit from shifting resources from these successful solutions to new developmental efforts that they, in turn, will supervise.

6.      These solicitations exemplify Government waste and mismanagement. Taxpayers have *already* shouldered the cost of development of the batCAVE platform and the Signal app. There are *no* concerns about the technology's performance. Indeed, they have won praise for

2

solving a vexing problem, as evidenced by several industry awards, the praise they received from end users, and IntelliBridge's multiple performance ratings of "exceptional" and "outstanding" in its Contractor Performance Assessment Reporting System (CPARS). Moreover, CMS is taking this step during a leadership vacuum, which has allowed officials in one division (cloud infrastructure) to make critical decisions about how a different division (information security) will carry out its mission. The decision to develop is not based on a considered determination about whether the technology is effective and can practicably be continued—it unquestionably is and can—but instead based on the type of irrational and wasteful incentives that section 3307 was meant to counteract. Thus, without relief, CMS will shelve extraordinarily successful cybersecurity technology that has already been built and vetted in favor of a wasteful developmental effort that has repeatedly failed. Even in the best-case scenario, where a contractor is ultimately successful in developing new technology replicating what IntelliBridge has already accomplished with batCAVE, such an effort will be highly uncertain and will likely take two to three years.

7.      CMS is therefore violating section 3307 in three respects.  First, it is seeking to develop new technology when it is eminently practicable to meet its requirements through existing nondevelopmental technology.  Second, it is taking this unlawful step without first conducting the type of market research that would reasonably be expected before shelving successful existing technology that solved a vexing problem in favor of an untested developmental solution.  Third, it has failed to use the results of such market research to make the three determinations that the law requires prior to embarking on a developmental effort.  The solicitations should therefore be enjoined pending CMS's compliance with section 3307.

## PARTIES

8.      Plaintiff RevaComm is a corporation incorporated under the laws of the State of Nevada. Its principal place of business is located at 677 Ala Moana Blvd, Honolulu, Hawaii 96813. As a small business in the enterprise digital transformation space, it developed the batCAVE platform and Signal app. RevaComm was later acquired by IntelliBridge in November 2023.

9.      Plaintiff IntelliBridge is a corporation incorporated under the laws of the State of Maryland. Its principal place of business is located at 1430 Spring Hill Road, McLean, Virginia 22102. Formed as part of a merger between two innovative technology companies, IntelliBridge provides cloud, cyber, intelligence and next-generation digital solutions to defense and national security customers. RevaComm is its wholly owned subsidiary.

10.     The Defendant is the United States acting through CMS.

## JURISDICTION

11.     This Court has jurisdiction over this action, and venue is proper, pursuant to 28 U.S.C. § 1491(b)(1). *See Sys. Application & Techs., Inc. v. U.S.*, 691 F.3d 1374, 1381 (Fed. Cir. 2012) (holding that § 1491 "provides a broad grant of jurisdiction" over a bid protest by a contract-awardee alleging a violation of procurement statute or regulation); *Percipient.ai, Inc. v. United States*, 104 F.4th 839, 851 (Fed. Cir. 2024) (affirming that "procurement" includes "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout").

12.     This Court has jurisdiction over IntelliBridge's challenges to CMS's failure to reasonably comply with its market research requirements, acquisition planning, and requirement structuring obligations before deciding to issue the challenged solicitations. These challenges constitute an "action by an interested party objecting to . . . [an] alleged violation of statute or regulation in connection with a procurement or proposed procurement." 28 U.S.C. § 1491(b)(1).

4

IntelliBridge alleges various violations of federal statute and regulation, including 41 U.S.C. § 3307 and FAR Parts 10, 11, and 12, in connection with CMS's proposed procurement of developmental ATO acceleration and scheduling-app solutions under, respectively, the CMS Hybrid Cloud Product Engineering & Operations ("CMS Hybrid Cloud") RFQ and an 8(a) sole-source solicitation for a Signal-app replacement.

## STANDING

13.     IntelliBridge is an interested party with standing to bring this protest. *See* 28 U.S.C. § 1491(b)(1); *Percipient.ai*, 104 F.4th at 858 (holding that "an interested party includes an offeror of commercial or nondevelopmental services or items whose direct economic interest would be affected by the alleged violation of the statute"); *see also Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1362 (Fed. Cir. 2009) (holding that the test for standing in pre-award protests is whether a plaintiff has established "a non-trivial competitive injury which can be redressed by judicial relief").

14.     IntelliBridge is a prospective offeror with a direct economic interest in meeting the procurement needs that are sought to be met through CMS's ATO acceleration developmental effort, including through the RFQ for the CMS Hybrid Cloud contract and the 8(a) solicitation for the Signal-app replacement.

15.     IntelliBridge is an interested party because it offers state-of-the-art technology as nondevelopmental products that (1) meet and even exceed the requirements of CMS's ATO acceleration effort and scheduling-app procurements, (2) have been deployed by CMS and the Air Force, and (3) are substantially likely to be acquired by CMS if CMS is required to comply with its obligations under § 3307 and the other provisions of law invoked in this Complaint.

16.     IntelliBridge is prejudiced by CMS's violations because but for the alleged violations of statute and regulation in connection with the RFQ and 8(a) solicitation, IntelliBridge

would submit a proposal for and have a substantial chance of winning a contract to satisfy CMS's ATO acceleration and assessment-scheduling software requirements via its already deployed nondevelopmental solutions. It could do so either by providing these tools directly by continuing its ongoing contract, through a separate procurement, or through the CMS Cloud Hybrid contract. IntelliBridge can meet the entire requirements of the RFQ even as it is currently (and unlawfully) structured.

17.    Further, but for the alleged violations of 41 U.S.C. § 3307 and implementing regulations, CMS would have structured its acquisition to allow IntelliBridge to compete to provide nondevelopmental technology solutions such as batCAVE and Signal, leaving IntelliBridge with a substantial chance of award.

## BACKGROUND

I.    **Government Agencies Must Prioritize The Procurement Of Nondevelopmental Items.**

A.    **41 U.S.C. § 3307 Requires Agencies To Procure Nondevelopmental Items "To The Maximum Extent Practicable," And To Conduct Related Market Research.**

18.    In 1994, Congress enacted the Federal Acquisition Streamlining Act ("FASA"), 41 U.S.C. § 3307. FASA requires agencies "to the maximum extent practicable" to procure commercial and nondevelopmental items to meet agency requirements.

19.    To implement this clear and mandatory preference, Congress imposed a series of requirements that apply both to civilian, non-defense contracts, 41 U.S.C. § 3307, and contracts entered into by agencies within the Department of Defense relating to national security, defense, or intelligence, 10 U.S.C. § 3453.

20.    Section 3307(b) ensures that agencies do not add artificial or unnecessary requirements that exclude nondevelopmental items from competing. It states:

*The head of each executive agency shall ensure that, to the maximum extent practicable—*

(1) requirements of the executive agency with respect to a procurement of supplies or services are stated in terms of—

> (A) functions to be performed;

> (B) performance required; or

> (C) essential physical characteristics;

(2) those requirements are defined so that commercial services or commercial products or, to the extent that commercial products suitable to meet the executive agency's needs are not available, nondevelopmental items other than commercial products may be procured to fulfill those requirements; and

(3) offerors of commercial services, commercial products, and nondevelopmental items other than commercial products are provided an opportunity to compete in any procurement to fill those requirements.

*Id.* (emphasis added).

21.    Section 3307(c) requires the "head of each executive agency" to ensure that procurement officials in that agency, "*to the maximum extent practicable*," "acquire commercial services or commercial products or nondevelopmental items other than commercial products to meet the needs of the executive agency." *Id.* § 3307(c)(1) (emphasis added).

22.    Section 3307 also contains requirements designed to prevent agencies from remaining ignorant of available nondevelopmental items either deliberately or through lax practices and inadvertence. Agencies must "conduct market research appropriate to the circumstances" before developing new specifications or soliciting bids or proposals, and "shall use the results of market research" to determine whether nondevelopmental items are available that:

(A) meet the executive agency's requirements;

(B) could be modified to meet the executive agency's requirements; or

(C) could meet the executive agency's requirements if those requirements were modified to a reasonable extent.

*Id.* §§ 3307(d)(1)-(2).

23.     Regulations implementing § 3307 provide that agencies should use market research to "determine the extent to which commercial products, or nondevelopmental items could be incorporated at the component level." 48 C.F.R. §§ 10.001(a)(3)(iii).

24.     Congress enacted FASA to address the waste and inefficiencies stemming from a history of long-term developmental contracts that did not sufficiently take advantage of existing technology. Such contracts led to cost overruns, wasted resources, unnecessary delay, and use of inferior and outdated technology. *See* S. Rep. 103-259, 1994 WL 184554, at *5 (May 12, 1994) (stating in the context of defense acquisitions that the traditional "process of procuring equipment and services for the government takes too long, costs too much, and suffers under a crushing burden of unnecessary overhead").

25.     The Senate Committee on Governmental Affairs stated that the "purchase of proven products such as commercial and nondevelopmental items can eliminate the need for research and development, minimize acquisition lead time, and reduce the need for detailed design specifications or expensive product testing." S. Rep. 103-258, 1994 WL 188485, at *5 (May 11, 1994). Its report also explained that under the current system, "the government frequently sets standards for its purchases that make them more costly, but not substantially more useful, than other products available through normal commercial channels." *Id.* at *14.

26.     The House Committee on Government Operations amplified the same concerns, stating:

> The Federal procurement system is still plagued with the all-too-common practice of buying expensive, specially-designed products, when off-the-shelf, commercial products would do the job just as well. In this era of fiscal restraint, the Federal Government must stop "re-inventing the wheel" and learn to depend on the wide array of products and services sold to the general public on a routine basis. Over the years, numerous commissions

and studies have recommended that the Government revise its policies to improve its ability to buy commercial products.

H. Rep. 103-545(I), 1994 WL 261997 (June 13, 1994).

**B.    Section 8(A) Small Business Set-Asides Do Not Displace The Mandatory Nondevelopmental Item Preference And CMS Cannot Rely On Using An 8(A) To Circumvent That Requirement.**

27.    None of the 8(a) provisions in 15 U.S.C. § 637(a) override the mandatory preference for nondevelopmental items in 41 U.S.C. § 3307 that requires acquisition of nondevelopmental items "to the maximum extent practicable." *See, e.g.*, *Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 546 (2010) ("Using an 8(a) or any other type of small business set-aside would not relieve the Air Force of its obligation to perform the acquisition planning and market research required by the FAR.").

28.    The nondevelopmental item preference that applies to civilian agencies, 41 U.S.C. § 3307, and its military analog, 10 U.S.C. § 3453, expresses an unequivocal congressional preference for nondevelopmental items with no exception for small business development efforts. That preference would be fatally undermined if subjected to an exception whenever there is an 8(a) program participant available to develop items to satisfy government requirements.

**II.    IntelliBridge Offers Nondevelopmental Products That CMS Can Practicably Procure To Meet CMS's ATO Acceleration Requirements, But CMS Is Proceeding With An Unlawful And Wasteful Developmental Effort.**

**A.    Under The Old ATO Process, CMS Faced Delays and Wasted Resources In Complying With the Process for Ensuring Software Applications Met Government Security Standards.**

29.    Government agencies are consistently in search of innovative ways to take advantage of new technology that advances agency missions while meeting stringent government cybersecurity requirements. Agencies are therefore responsible for processing and issuing Authorizations to Operate ("ATOs") to software apps that connect to their information systems.

30.    Prior to contracting with RevaComm, CMS had long struggled with this problem. CMS provides health coverage to more than 160 million people through Medicare, Medicaid, the Children's Health Insurance Program, and the Health Insurance Marketplace. It is the single largest payer for healthcare in the United States, serving some of the most vulnerable and at-risk populations in the country.

31.    CMS is responsible for serving all of these individuals and making sure that they have access to high quality healthcare services. To fulfill its mission, CMS relies on hundreds of apps and is continually identifying and building more apps to keep pace with modern technology.

32.    Apps perform a variety of critical tasks for CMS. One example is the iQIES app. Through the iQIES app, CMS can review patient assessment data and quality measures for providers on one user-friendly platform. Collecting and centralizing this information on an app allows CMS to monitor trends and look for areas of improvement in patient care. Another example are apps that assist with highly complex claims processing tasks.

33.    Because of the importance of these apps to CMS's operations and the associated importance of ensuring that they are secure, the National Institute of Standards and Technology (NIST) within the U.S. Department of Commerce has issued specific security protocols and policies for federal information systems, which apply to apps that connect to CMS's systems. In addition, apps must comply with the Zero Trust security framework recently adopted by the federal government (Exec. Order No. 14028 (2021)). And specific to CMS's mission, any apps that store or manage protected health information must also comply with the Health Information Portability and Accountability Act (HIPAA).

34.     App developers must then demonstrate and certify that their apps meet the requirements through the ATO process.

35.     Securing an ATO at CMS had historically been a long and expensive ordeal that could last over a year, cost the app developer hundreds of thousands of dollars, and delay the benefits of the technology to CMS. An ATO is also only good for three years, after which the app developer must repeat the entire process.

36.     A related problem was that the ATO process occupied substantial portions of app developer time and resources and disincentivized them from innovating to improve their products. As CMS's former Chief Information Security Officer (CISO) Robert Wood explained, developers did not continuously deploy or improve their apps "because change is viewed as a bad thing, because you have to do security impact analyses, you have to maybe even go through a new ATO if you're redesigning things significantly."[1] The former CISO further lamented that "[t]here's all of this compliance process that ends up becoming the focus of development teams, which is definitely not where we want people spending their time and energy."[2]

37.     Officials in CMS's Infrastructure and User Services Group, which oversees the infrastructure for CMS's in-house cloud platform ("CMS Cloud"), had previously tried, and failed, to develop and transform CMS Cloud into a platform-as-a-service tool for rapid app deployment. Their failed efforts include a three-year, $56.5 million contract that ended in September 2022.

38.     That same year, the former CISO announced an "all-out assault" to speed up and streamline the ATO process.[3] He stated that CMS needed "to be able to change as an institution in

---

[1] Justin Doubleday, *CMS Takes A Page From The Air Force On Streamlining Software Development*, Federal News Network (Feb. 18, 2022), https://federalnewsnetwork.com/cybersecurity/2022/02/cms-takes-a-page-from-the-air-force-on-streamlining-software-development/.

[2] *Id.*

[3] *Id.*

the healthcare arena faster, and more stably, more than ever." [4] The former CISO found this solution in IntelliBridge's Continuous Authorization and Verification Engine platform-as-a-service (also known as "batCAVE").

**B.    IntelliBridge Addressed CMS's Problem By Implementing A Highly Praised Solution Modeled On A Similar Platform It Developed For The Air Force.**

39.    IntelliBridge (through its acquisition of RevaComm) has almost thirty years of experience in delivering scale, speed, and security for government agencies facing evolving IT challenges and cybersecurity threats.

40.    RevaComm's success in this area includes its design of a program known as Platform One for the Air Force that markedly improved the efficiency of the Air Force's ATO process.  RevaComm began its work on Platform One in July 2020, and it is now fully developed and in use to this day. In fact, over 200 software teams are developing and deploying their apps through Platform One. Many of these teams are standing up their own installations through the Platform One baseline IaC/CaC Big Bang, which allows developers to deploy and manage multiple apps at once.

41.    CMS was impressed by IntelliBridge's work for the Air Force and recognized that IntelliBridge could deliver a similar platform-as-a-service solution to meet CMS's ATO acceleration needs. CMS awarded IntelliBridge a Small Business Innovation Research ("SBIR") Phase III award for the deployment of batCAVE in September 2021 (the "batCAVE Contract").

42.    In awarding the contract, CMS acknowledged that its information technology systems took "years to develop and fail[ed] to take the user and his/her preferences into account until it is too late to change," and that users experienced "frustration" with the "inability to get software fixed or updated in a timely manner when it breaks."  Therefore, CMS sought to procure

---

[4] *Id.*

batCAVE "to support more rapid development of secure and usable systems using a platform-as-a-service (Paas) deliver and operations model."

43.    Between September 2021 and September 2023, CMS awarded IntelliBridge four task orders under the batCAVE Contract. These task orders provided for the sustainment of batCAVE, in addition to procuring IntelliBridge's migration services to assist CMS in moving apps over to the platform. The second task order, specifically, was for the procurement of the Signal app (discussed in Section II(D) below). CMS has exercised Option Year 1 and Option Year 2 for task orders one and two, and Option Year 1 for task orders three and four.

44.    The batCAVE platform reduces costs and accelerates the ATO process by offering a built-in suite of tools, resources, and security control mapping that automate about 75% of the cybersecurity and compliance processes needed to obtain an ATO. Thus, by deploying their apps to batCAVE, software developers avoid highly time-consuming and resource-intensive manual documentation, assessment, testing, and evidence production that otherwise would be required. The level of automation provided by batCAVE has reduced the time to obtain an ATO from years to under three months.

45.    The batCAVE platform also separately provides CMS with continuous security monitoring tools that ensure that every app update complies with CMS's cybersecurity requirements. As explained above, ATOs must be recertified every three years. But in the interim, app developers may decide to push out minor updates that are not subject to the ATO process. The batCAVE platform's security monitoring tools ensure that every app update (from the major to the minor) complies with CMS's cybersecurity requirements. These tools also obviate the need for ATO recertification. By virtue of their deployment on batCAVE, apps are continuously in compliance.

46.    The CMS team led by the former CISO understood the value of the batCAVE platform and promoted its use by app developers. The former CISO explained that in developing batCAVE, his team "did a lot of user research, a lot of user validation, a lot of digging into the data about what our systems look like, the ATO process and things like that we had these efforts that preceded the BatCave that really informed how we were going to build and what we were going to build." [5] The result was a "DevSecOps platform" that successfully reduced the time from app development to production.[6] The former CISO stated that batCAVE's ability to automate up to 80% of the required security controls is one of its biggest benefits.[7]

47.    IntelliBridge has also received several industry awards for developing batCAVE. FORUM FedHealth IT, a respected news source in the federal health contracting space, awarded batCAVE for "Disruptive Technology" and "Innovation" in 2023 and 2024, respectively.[8]

48.    In addition, IntelliBridge has received lots of positive feedback from developers who have chosen to deploy their apps to the batCAVE platform. They appreciate that batCAVE makes many of their processes easier and provides their apps with continuous, high-level security. As one example, a batCAVE customer recently told IntelliBridge that "One of the main reasons we moved to batCAVE was to keep compliant and use the security settings on the batCAVE ATO, we don't want to compromise that." Another customer stated that "From a technical aspect, it is

---

[5] Jason Miller, *'Batcave' Signals CMS' Progress Toward Moving To The Cloud*, Federal News Network (Jan. 24, 2023), https://federalnewsnetwork.com/cloud-computing/2023/01/batcave-signals-cms-progress-toward-moving-to-the-cloud/.

[6] *Id.*

[7] *Id.*

[8] *Disruptive Tech Summit*, FORUM (2023), https://events.govforum.io/disruptive-tech-summit/#winners; *Forum Innovation Awards*, FORUM (2024), https://events.govforum.io/forum-innovation-awards/#winners.

the best and correct approach to these types of applications." He specifically praised batCAVE's capabilities for resolving issues in production and restarting services.

**C.    Upon the Departure of CMS Officials Who Supervised the Successful batCAVE Effort, The Agency Officials Responsible For Prior Failures Are Seeking To Unlawfully Replace batCAVE With A New Developmental Solution.**

49.    Notwithstanding batCAVE's unequivocal success in ATO acceleration, CMS officials who resisted the change and championed the failed approaches of the past are now seeking to take advantage of a leadership vacuum to unlawfully develop the core ATO functionality that batCAVE already provides. This shift has occurred not because of a considered (and legally required) determination that it is impracticable to continue with batCAVE—rather, it has occurred because the officials who championed batCAVE left, and officials who led prior failed efforts want to shift resources to a developmental approach that would be supervised by *their* office.

50.    The first consequential departure occurred in November 2023 when the former Chief Information Officer (CIO), a batCAVE supporter, moved to become the CIO at the IRS. CMS has yet to replace its CIO, and it is currently operating under an Acting CIO.

51.    The CIO's departure was followed by that of the Chief Information Security Office, who had been the official primarily responsible for implementing batCAVE and had earned widespread praise during his tenure for his innovative leadership.

52.    These departures resulted in a power vacuum that is being exploited by legacy officials to move to develop a new developmental solution to address the problems that batCAVE already addressed to great acclaim.

53.    This has taken place in three related steps. First, on April 22, 2024, the Infrastructure and User Services Group released a Request for Information ("RFI") in support of the division's maintenance of CMS's cloud infrastructure. Ex. A. The Statement of Objectives

15

("SOO") attached to the RFI addresses in part the consolidation of data centers and related cloud-computing services. Ex. B at 8-10. However, IntelliBridge was surprised to discover that batCAVE was listed among the contracts that CMS intended to consolidate under one CMS Cloud contract. *See id.* at 9. At the same time, the RFI failed to seek any information that would reasonably be necessary to take the extraordinary step of replacing a highly successful platform-as-a-service tool to pursue a new untested developmental solution. *See* Ex. A at 3.

54.    Second, CMS has paired the new solicitation with a decision to discontinue most of the batCAVE Contract. It notified IntelliBridge of this decision at essentially the same time that it issued the RFI. By terminating most of batCAVE, the officials responsible for the prior failed efforts to develop a platform-as-a-service tool for ATO acceleration will be able to shift resources dedicated to batCAVE to an unlawful and quixotic developmental effort that they will be supervising.

55.    Third, on July 11, 2024, the Infrastructure and User Services Group issued an RFQ for the CMS Hybrid Cloud contract, numbered 75FCMC24Q0011. Certain requirements are unobjectionable, including consolidating several cloud-computing contracts into one large program, to reduce the number of data centers used by CMS to perform functions under various contracts. IntelliBridge is capable of meeting those requirements and indeed, all of the requirements of the contract.

56.    At the same time, the SOO attached to the RFQ contains various provisions that call for proposals to develop functionality that batCAVE already provides, including increased automation that enables CMS to bring new apps to scale securely and efficiently. The SOO (Amendment Four) states that "Cloud Computing has afforded CMS the ability to scale up critical applications to meet the agency's Program specific goals while maintaining CMS technical

architecture and security standards." Ex. C. at 7. It recognizes that "CMS has a continually growing need for agile and scalable infrastructure hosting environments," which includes the need for an "extensible platform with a Platform as a Service (PaaS) and Engineering Support Services operating model" for CMS app developers, and "[p]roduct implementation services," that enable "DevOps methods and processes with a focus on self-service and automation." *Id.*

57.    To meet these general goals, the SOO states:

> Automated Product Vending – **The Contractor shall develop and operate a modular product vending solution that enables customers to receive, both at initial onboarding and during normal operations, hosting service products and services.** This solution should define the initial set of products to be vended at initial onboarding into the hosting service to allow the customer to quickly build and deploy their applications and it should support post go-live vending of add-on products used by customers on an as needed basis. Initial vending should include base VPC deployments, security scanning products, gold image products, logging products, baseline DevSecOps products, backup/restore products, and authentication products, at a minimum. Post go-live products to be automatically vended should include performance testing products, APM and advanced monitoring products, and disaster recovery, at a minimum. This solution should be fully automated and incorporated into customer support workflows and triggered at appropriated times during the customer journey.

*Id.* at 16 (emphasis added).

58.    This is exactly what batCAVE already does – it is a "modular product vending solution" that allows CMS to "quickly build and deploy" apps and supports future improvements and updates, i.e., "post-live vending of add-on products."

59.    The batCAVE platform also automates about 75% of CMS's cybersecurity and compliance processes, which is far ahead of the limited automation currently provided by CMS Cloud. The RFQ calls for development of specific tools that batCAVE already provides for meeting the SOO's stated goals for supporting CMS app developers. Examples include:

| Features Not Available in The CMS Cloud Without batCAVE | Features Currently Available in batCAVE | Features CMS Seeks To Develop Through the RFQ (Ex. C at 8) |
|---|---|---|
| The CMS Cloud is far behind in developing templates, including Terraform modules. This means that there is no uniform programming language used by app developers, which impedes CMS's ability to standardize its deployment workflow. | The batCAVE team has built templates for Infrastructure as Code (IaC) components that can be used to onboard similar apps with other app developers. These templates promote faster deployment times and technology standardization. The batCAVE team has also provided documentation to execute these best practices.<br><br>Specifically, batCAVE has created numerous reusable sets of Terraform modules, which are the foundation of a PaaS. Promoting the use of Terraform modules is important to establishing an enterprise-wide solution. | **Reusable**: Productize and templatize cloud computing resources and services at CMS to promote consistency, efficiency, and best practices across the enterprise. |

| Features Not Available in The CMS Cloud Without batCAVE | Features Currently Available in batCAVE | Features CMS Seeks To Develop Through the RFQ (Ex. C at 8) |
|---|---|---|
| The CMS Cloud tool kit lacks many modern features: <br><br> • Signification portions of CMS Cloud are not declarative. To program for CMS Cloud, specific instructions must be executed in exact order. This makes the code for CMS Cloud more complex and difficult to maintain. <br><br> • CMS Cloud does not assist app developers with continuous integration and continuous delivery/continuous deployment or deployment integration. Specifically, CMS Cloud does not provide integrated test suites, logging and monitoring tools, code deployment, or vulnerability management tools. This means developers are forced to spend time and money testing and modifying their apps before they can be deployed to the CMS Cloud infrastructure. <br><br> • CMS Cloud lacks the ability to deploy stateless apps. That means all user session data must be saved on the server where the app runs. Apps that handle a lot of traffic or transactions may crash or slow down. | The batCAVE platform was built on modern tools, specifically: <br><br> • batCAVE is fully declarative. Declarative programming focuses on the program's goals without step-by-step instructions. That means batCAVE's code is easily readable and maintainable. <br><br> • batCAVE minimizes divergence between development and production. When a developer builds an app on their personal system that is locally hosted, it can take time to configure the app with CMS's systems and servers. batCAVE reduces the amount of configuration necessary so that apps, once developed, can be more quickly deployed. batCAVE also uses continuous deployment via gitOps and FluxCD. <br><br> • batCAVE was built on Kubernetes, an open-source system for automating deployment, scaling, and management of containerized applications. This allows developers to deploy stateless apps, which can scale more easily by distributing user requests across multiple servers. | **Adaptable**: Build on a modern software technology stack, leveraging infrastructure as code and 12 factor app best practices, that promote flexibility, scalability, and reliability. |

| Features Not Available in The CMS Cloud Without batCAVE | Features Currently Available in batCAVE | Features CMS Seeks To Develop Through the RFQ (Ex. C at 8) |
|---|---|---|
| CMS Cloud only automates 30-35% of CMS's cybersecurity and compliance processes. ATO certification is also a fixed point in time. After granting an ATO, there are no controls in place to ensure that each update complies with CMS's cybersecurity requirements, until the app goes through the ATO recertification process three years later. | batCAVE automates about 75% of CMS's cybersecurity and compliance processes. This automation applies to every update, so apps are continuously in compliance. batCAVE also provides real-time monitoring. | **Secure:** Ensure secure, reliable services that protect PII/PHI through adherence to FISMA High Impact General Support System (GSS) standards. Use automation to the greatest possible degree to ensure that natural human error does not adversely affect CMS' enterprise security posture. |
| CMS Cloud has no solution that provides built-in security. That means app developers are required to build to CMS's unique systems and infrastructure, so there is no "self-service" or automation. | The batCAVE team has developed playbooks, automated tasks, and focused on DevSecOps methods and processes. Their efforts allow app developers to focus on substantive programming instead of wasting their time on figuring out CMS's unique systems and infrastructure, which they would have to re-learn and repeat for different tasks. | **Modernization and simplification**: product implementation services, enabling DevSecOps methods and processes with a focus on self-service and automation, to provide for simplified implementation and operations with increased operational reliability. Help ADOs [Application Development Organizations] focus on delivering business value quickly and continuously using native cloud services which provide an abstraction layer over physical and virtual hardware, network and security devices or tools. |

**D.    CMS Is Separately Proceeding Through a Secret Sole-Source Procurement to Develop New Software to Mirror Features of IntelliBridge's Nondevelopmental Signal App.**

60.    In tandem with its unlawful efforts to develop a new version of the functionality that batCAVE already provides, CMS has separately issued an unlawful sole-source solicitation to develop a scheduling app that IntelliBridge already provides as a nondevelopmental product.

61.     CMS originally asked IntelliBridge to develop Signal as part of the batCAVE Contract after learning that IntelliBridge had previously developed a scheduling app for the Air Force.

62.     Before Signal, the scheduling process for cybersecurity and compliance assessments was lengthy and difficult. It required a lot of back-and-forth communication to secure dates, as well as a long intake form.

63.     IntelliBridge's Signal app solved that problem for CMS. It allows app developers to track their assessment status and view upcoming deadlines on a user dashboard. Signal has transformed what used to be a very manual process by making all the information available in one place.

64.     After CMS told IntelliBridge that it did not plan on exercising the remaining option years on the batCAVE Contract in late April 2024, CMS's Acting CISO Keith Busby reached out to the IntelliBridge team to tell them that CMS liked the Signal app and wanted to retain its functionality separate from the batCAVE Contract it was terminating in favor of the new CMS Hybrid Cloud developmental effort.  The relevant task order of the batCAVE Contract expires on September 29, 2024, which created a time crunch for CMS.  Mr. Busby claimed that CMS was concerned about the acquisition timeline and wanted to quickly issue an award for the Signal app so that there was no potential gap in services. He stated that CMS had identified a small business, Fearless Solutions, LLC ("Fearless"), for the issuance of an 8(a) sole-source solicitation. The plan was for Fearless to then procure the Signal app for CMS through a subcontract with IntelliBridge.

65.     In response, IntelliBridge expressed its interest in entering into a subcontract for the provision of the Signal app, or otherwise directly contracting with CMS.

66.    Then, in early May 2024, IntelliBridge lobbied its congressional representatives to investigate CMS's wasteful and short-sighted decision to abandon the fully developed batCAVE platform. CMS's attitude towards IntelliBridge became even more hostile as a result.

67.    When IntelliBridge followed up with Mr. Busby a few weeks later, he claimed that a problem arose with Fearless, and that CMS had decided to find a different small business for the 8(a) solicitation.

68.    IntelliBridge followed up again in late June 2024. IntelliBridge even offered to sell its data rights to Signal or enter into an ID/IQ with CMS separate from the overall batCAVE Contract. Mr. Busby rejected IntelliBridge's offer, stating that he had given instructions for a different direction. Accordingly, and even though it is eminently practicable to meet its requirements through simply contracting for continued use of Signal, CMS is proceeding to issue a nonpublic solicitation to develop new software to meet the same requirements. Still worse, it is doing so through an entirely opaque process with no published solicitation or award.

## CLAIMS FOR RELIEF

### COUNT I
**CMS Violated 41 U.S.C. § 3307 and Related Regulations
By Refusing To Solicit The ATO Acceleration Platform As A Nondevelopmental Item**

69.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

70.    Under 28 U.S.C. § 1491(b)(4), this Court must set aside as unlawful any solicitation or award that violates the standards set forth in 5 U.S.C. § 706. Section 706 provides that an agency action must be set aside if it is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

71.    Section 3307 and related regulations require that CMS ensure "to the maximum extent practicable," that the RQF define its requirements in such a manner so that

22

nondevelopmental items "may be procured to fulfill those requirements." 41 U.S.C. § 3307(b)(2). By unnecessarily and irrationally bundling together the requirement for the consolidation of CMS Cloud infrastructure contracts and the supposed requirements for a new platform-as-a-service tool for rapid app deployment, the RFQ violated this statutory requirement.

72.     Section 3307 and related regulations also require that CMS ensure "to the maximum extent practicable," the acquisition of "commercial services, commercial products, or nondevelopmental items other than commercial products to meet the needs of the agency." *Id.* § 3307(c)(1).

73.     IntelliBridge has a nondevelopmental item that meets and exceeds CMS's ATO acceleration requirements. IntelliBridge's batCAVE platform is currently deployed on CMS Cloud, and IntelliBridge has offered to continue its support. CMS rejected that offer.

74.     Notwithstanding the practicability of meeting its requirements through continued procurement of batCAVE or negotiating a new contract for the continued use of this nondevelopmental item, CMS is proceeding with a new procurement to develop a platform-as-a-service tool to provide the functionality that batCAVE already provides as a nondevelopmental item.

75.     CMS therefore has failed to meet its obligation to ensure, to the maximum extent practicable, that it procures nondevelopmental items to meet the ATO acceleration requirements as set forth in § 3307 and related regulations.

76.     This failure by CMS violates at least the following statute and regulations: 41 U.S.C. § 3307, 48 C.F.R. § 11.002, and 48 C.F.R. § 12.101. CMS's failure to comply with these provisions is irreparably harming IntelliBridge and the public interest by preventing continued deployment of batCAVE in lieu of a wasteful development-oriented solution.

77.    In response to the notice of protest, CMS added a boilerplate reference to section 3307 requiring the contractor to comply with that provision.  Ex. C at 40-41. This did not remedy the basic defects in the solicitation because it did not alter any of the core requirements of the RFQ that are addressed herein and above. By resorting to eleventh hour boilerplate rather than remedying the solicitation's defects, CMS only has confirmed the unlawfulness of the solicitation.

78.    Accordingly, and for all of the foregoing reasons and those set forth more thoroughly in the body of the Complaint, the RFQ should be set aside as a solicitation that is in conflict with the mandatory nondevelopmental item preference and therefore "not in accordance with law."

## COUNT II
### CMS Violated 41 U.S.C. § 3307 and Related Regulations
### By Refusing To Solicit The Assessment-Scheduling App As A Nondevelopmental Item

79.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

80.    Under 28 U.S.C. § 1491(b)(4), this Court must set aside as unlawful any solicitation or award that violates the standards set forth in 5 U.S.C. § 706. Section 706 provides that an agency action must be set aside if it is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

81.    Section 3307 and related regulations require that CMS ensure "to the maximum extent practicable," the acquisition of "commercial services, commercial products, or nondevelopmental items other than commercial products to meet the needs of the agency."  41 U.S.C. § 3307(c)(1).

82.    IntelliBridge has a nondevelopmental item that meets and exceeds CMS's requirements for an assessment-scheduling app. It is practicable for CMS to acquire the Signal app

through a variety of contractual vehicles—including continuation of Task Order 2 of the batCAVE Contract, by entering into a subcontract with a small business selected by CMS, and by contracting directly with CMS to provide the data rights.

83.   Originally, CMS stated that it would procure the Signal app by issuing an 8(a) sole-source solicitation that directed a small business to subcontract with IntelliBridge. However, after CMS discovered IntelliBridge's lobbying efforts related to the batCAVE Contract, CMS stated that its plans had changed and that it was going in a different direction.

84.   CMS is using the 8(a) program to launch a developmental effort to replicate the functionality of the Signal app. Therefore, CMS has failed to meet its obligation to ensure, to the maximum extent practicable, that it procures nondevelopmental items to meet its assessment-scheduling requirements as set forth in § 3307 and related regulations.

85.   This failure by CMS violates at least the following statute and regulations: 41 U.S.C. § 3307, 48 C.F.R. § 11.002, and 48 C.F.R. § 12.101. CMS's failure to comply with these provisions is irreparably harming IntelliBridge and the public interest by preventing continued deployment of Signal in lieu of a wasteful development-oriented solution.

86.   Accordingly, and for all of the foregoing reasons and those set forth more thoroughly in the body of the Complaint, the 8(a) solicitation should be set aside as a solicitation that is in conflict with the mandatory nondevelopmental item preference and therefore "not in accordance with law."

<u>**COUNT III**</u>

**CMS Violated 41 U.S.C. § 3307 And Related Regulations By Failing To Conduct Sufficient Market Research To Determine the Practicability of Acquiring Nondevelopmental Items To Meet Its ATO Acceleration Requirements**

87.     The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

88.     Under 28 U.S.C. § 1491(b)(4), this Court must set aside as unlawful any solicitation or award that violates the standards set forth in 5 U.S.C. § 706. Section 706 provides that an agency action must be set aside if it is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

89.     41 U.S.C. § 3307 contains requirements designed to prevent agencies from remaining ignorant of available nondevelopmental items. Agencies must "conduct market research appropriate to the circumstances" before developing new specifications or soliciting bids or proposals and "shall use the results of market research" to determine whether nondevelopmental items are available that (1) meet the agency's requirements; (2) could be modified to meet the agency's requirements; or (3) could meet the agency's requirements if those requirements were modified to a reasonable extent. 41 U.S.C. §§ 3307(d)(1)-(2).

90.     Regulations implementing § 3307 provide that agencies should use market research to "determine the extent to which commercial products, or nondevelopmental items could be incorporated at the component level." 48 C.F.R. § 10.001(a)(3)(iii).

91.     CMS failed to conduct market research "appropriate to the circumstances"— including in this case, failing to explore various options for continuing batCAVE and the cost overruns, inefficiencies, delays, and poor outcomes that could result from a developmental effort to replace a solution that taxpayers *already paid for* and which customers love.

92.     Its failure to conduct appropriate market research is particularly concerning in this case because CMS has not filled its open positions for Chief Information Officer or Chief Information Security Officer even though those officials had been responsible for procuring, implementing, and supervising batCAVE. This leadership vacuum has allowed other divisions within CMS, such as the Infrastructure and User Services Group, to guide the process.  These officials are incentivized to favor a developmental solution that would shift resources to a risky developmental effort that they would supervise. Further, they lack the requisite knowledge and experience with batCAVE and information security more generally, yet have unlawfully proceeded with the new procurement without conducting the market research that section 3307 requires as to the benefits of the nondevelopmental solution that batCAVE provides, as well as the costs and risks of attempting to hire a contractor to develop new technology to replicate its functionality.

93.     CMS also failed to use the results of any market research to make the three determinations that section 3307 requires—*i.e.*, whether nondevelopmental items are available that (1) meet its requirements; (2) could be modified to meet its requirements; or (3) could meet its requirements if those requirements were modified to a reasonable extent. Had CMS done so, it would have concluded that it was practicable to acquire batCAVE and highly risky and wasteful to do anything else.

94.     Accordingly, and for all of the foregoing reasons and those set forth more thoroughly in the body of the Complaint, the RFQ should be set aside as a solicitation that was based on legally inadequate market research and therefore "not in accordance with law."

## COUNT IV

**CMS Violated 41 U.S.C. § 3307 And Related Regulations By Failing To Conduct Sufficient Market Research To Determine Whether Nondevelopmental Items Exist That Might Satisfy Its Assessment-Scheduling Needs**

95.     The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

96.     CMS also failed to conduct market research "appropriate to the circumstances" prior to proceeding with a new procurement to develop the Signal app.  The relevant circumstances include its knowledge of a nondevelopmental item that it knows and has acknowledged to meet its requirements. Appropriate market research would have included at a minimum, various contractual options for procuring Signal either through or separate from the batCAVE contract as well as the cost overruns, inefficiencies, delays, and poor outcomes that could result from a developmental effort to replace a solution that taxpayers *already paid for* and which customers love.

97.     CMS also failed to use the results of any market research to determine whether nondevelopmental items are available that (1) meet its requirements; (2) could be modified to meet its requirements; or (3) could meet its requirements if those requirements were modified to a reasonable extent. Had CMS done so, it would have concluded that it was practicable to acquire Signal in lieu of developing new technology to do what Signal already does.

98.     Accordingly, and for all of the foregoing reasons and those set forth more thoroughly in the body of the Complaint, the 8(a) solicitation should be set aside as a solicitation that was based on legally inadequate market research and therefore "not in accordance with law."

<u>COUNT V</u>
**CMS Engaged In Arbitrary, Capricious, And Unlawful Conduct By Pursuing a
Developmental Solution to Meet Requirements that batCAVE and Signal Already Satisfy**

99.     The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

100.     Under 28 U.S.C. § 1491(b)(4), this Court must set aside as unlawful any solicitation that violates the standards set forth in 5 U.S.C. § 706.  Section 706 provides that an agency action must be set aside if it is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  As shown in each of the Counts set forth above, the RFQ and 8(a) solicitation violated numerous provisions of law, and hence were "not in accordance with law."  In addition, and independent of all of those specific legal violations set forth in Counts One through Four, CMS's conduct was arbitrary and capricious.  This is an independent ground for setting aside the solicitations, as provided for in § 706(2)(A).  The arbitrary and capricious conduct includes (i) proceeding to develop software to meet requirements that are already amply satisfied by existing nondevelopmental solutions when it is practicable to do otherwise; and (ii) proceeding with developing solutions without adequately informing themselves of the costs of doing so or determining the practicability of various ways that nondevelopmental solutions could be procured to meet their requirements, including exploration of alternative contractual vehicles for acquiring the batCAVE platform and Signal app.

101.     In addition, CMS has proceeded with development of Signal in bad faith retaliation for IntelliBridge's exercise of its First Amendment rights related to abandonment of the batCAVE platform. Prior to IntelliBridge's contacting of members of the Hawaii delegation, CMS had acknowledged the value of the Signal app and was preparing to enter into a contract under which IntelliBridge would have supplied Signal to CMS.  Following IntelliBridge's outreach to Capitol

Hill officials, CMS stopped its efforts to acquire Signal and proceeded to pursue a new contract to acquire that functionality through a developmental effort in lieu of acquiring Signal. Retaliation for the exercise of constitutionally protected rights is quintessential bad faith.

102.    Accordingly, for all of the foregoing reasons and those set forth more thoroughly in the body of the Complaint, the solicitations should be set aside as the product of arbitrary and capricious decision-making and bad-faith retaliation.

## **PRAYER FOR RELIEF**

WHEREFORE, IntelliBridge respectfully requests that the Court:

1.    Enter a permanent injunction[9] requiring CMS to rescind the RFQ and 8(a) solicitation pending corrective action necessary to remedy its legal violations, including by removing any effort, express or implied or pursued in any way, to procure developmental work to replicate the functionality of batCAVE or Signal, and/or by conducting necessary market research, using the market research to make  the determinations required by section 3307, and issuance of revised solicitations that comply with CMS's legal obligations to define its requirements in a manner that solicits bids from offerors who will provide commercial or nondevelopmental items to meet CMS's requirements; and

2.    Enter such other relief as the Court considers just and proper.

---

[9] IntelliBridge does not seek a preliminary injunction with the filing of this complaint but reserves the right file such a motion after meeting and conferring with counsel from the Department of Justice.

Respectfully Submitted,


By: /s/ Hamish P.M. Hume

Hamish P.M. Hume (Counsel of Record)
Samuel C. Kaplan
Gina A. Rossman
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
(202) 237-2727 (t)
(202) 237-6131 (f)
hhume@bsfllp.com
skaplan@bsfllp.com
grossman@bsfllp.com

Dated: August 7, 2024                    *Counsel for Plaintiffs IntelliBridge, LLC and RevaComm, Inc.*